AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

In the Matter of the Search of
3958 E. Main Street, Mesa, Arizona 85205
**(Subject Premises A-1)**

Case No. 22 - 3038 MB

**(Filed Under Seal)**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A.**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 924(a)(1)(A) | False Statements During the Acquisition of a Firearm |
| 18 U.S.C. § 922(m) | False Statements By a Licensed Dealer |

The application is based on these facts:

**See attached Affidavit of Special Agent Gregory Lipner.**

☒ Continued on the attached sheet.

☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Coleen Schoch

GREGORY LIPNER  Digitally signed by GREGORY LIPNER
Date: 2022.03.01 15:26:17 -07'00'

*Applicant's Signature*

Gregory Lipner, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3-2-22 @ 11:48 A.M.

M Morrissey

*Judge's signature*

City and state: Phoenix, Arizona

Honorable Michael T. Morrissey, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

### Property to Be Searched

The premises and property to be searched is American Guns & Ammo, a business located at 3958 E. Main Street, Mesa, Arizona 85205 (**Subject Premises A-1 Subject Premises A-1** is located at the corner of E. Main Street and N. Sulleys Drive, on the southwest corner of the Perri Plaza shopping complex. The structure is a one-story tan brick building with a red roof. The main entrance is located on the eastside of the building with two glass doors that open from the center outward. Multiple "American Guns & Ammo" signs are affixed to the eves and multiple "GotGuns.Net" signs are attached to the façade of the structure.



## ATTACHMENT B

### *Property to be seized*

Agents are authorized to search for evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 924(a)(1)(A) (False Statements During the Acquisition of a Firearm), 922(m) (False Statements by a Licensed Dealer), as further described in the Affidavit of probable cause including:

1.  Records concerning the sales or transfers of firearms or ammunition that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020 to the present, including FFL Acquisition and Disposition records, ATF Forms 4473, NICS inquiries and background checks, and any other records required by ATF to be maintained by FFLs, as well as any books, records, receipts, notes, ledgers, invoices, and any other documentation related to those sales or transfers of firearms or ammunition;

2.  Records, receipts, or other paperwork showing the purchase, storage, disposition, or dominion and control over firearms and ammunition sold or transferred in transactions that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present;

3.  Records of communications with or containing the names, telephone numbers, addresses, or other identifying information of known or suspected co-conspirators, known or suspected firearms traffickers, and any individuals involved in transactions that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present;

4.  Records regarding the receipt, deposit, transfer, possession, transportation, or use of the proceeds of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present, including but not limited to account information, direct deposit confirmations, wire transfers, check stubs, use of PayPal or

other electronic money transfer services, check or money order purchase receipts, and receipts or documents regarding purchases of real or personal property;

5.   Photographs, including still photos, negatives, slides, videotapes, and films, showing known or suspected co-conspirators, known or suspected firearms traffickers, or individuals involved in transactions that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present, as well as those that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present;

6.   Up to $11,150 in U.S. currency, which represents money known to be paid in transactions detailed in the affidavit, which involved firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present;

7.   Indicia of occupancy, residency, rental, ownership, or use of the **Subject Premises**, including, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

8.   Safe deposit box keys, storage locker keys, safes, and related secure storage devices, and documents relating to the rental or ownership of such units;

9.   Computers, cellular telephones, tablets, and other media storage devices, such as thumb drives, CD-ROMs, DVDs, Blu Ray disks, memory cards, and SIM cards (hereafter referred to collectively as "electronic storage media");

10.   Records evidencing ownership or use of electronic storage media, including sales receipts, registration records, and records of payment;

11.   Any records and information found within the digital contents of any electronic storage media seized from the **Subject Premises**, including:

a.   Records concerning the sales or transfers of firearms or ammunition that are indicative of firearms trafficking, straw purchasing, or false

2

statements in ATF Forms from January 1, 2020 to the present, including FFL Acquisition and Disposition records, ATF Forms 4473, NICS inquiries and background checks, and any other records required by ATF to be maintained by FFLs, as well as any books, records, receipts, notes, ledgers, invoices, and any other documentation related to those sales or transfers of firearms or ammunition;

b.      Records, receipts, or other paperwork showing the purchase, storage, disposition, or dominion and control over firearms and ammunition sold or transferred in transactions that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present;

c.      Records containing the names, telephone numbers, addresses, or other identifying information of known or suspected co-conspirators, known or suspected firearms traffickers, and any individuals involved in transactions that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present;

d.      Records regarding the receipt, deposit, transfer, possession, transportation, or use of the proceeds of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020 to the present, including but not limited to account information, account statements, direct deposit confirmations, wire transfers, check stubs, PayPal or other electronic money transfer services, check or money order purchase receipts, and receipts or documents regarding purchases of real or personal property;

e.      All photographs and videos showing known or suspected co-conspirators, known or suspected firearms traffickers, or individuals involved in transactions that are indicative of firearms trafficking, straw

3

purchasing, or false statements in ATF Forms from January 1, 2020, to the present, as well as those that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present;

f.  Records of communications with known or suspected co-conspirators, known or suspected firearms traffickers, and any individuals involved in transactions that are indicative of firearms trafficking, straw purchasing, or false statements in ATF Forms from January 1, 2020, to the present, including but not limited to voice or video calls, voice, video, or text messages, e-mail, social media and social media messaging, and any other messaging applications;

g.  any information recording schedule or travel;

h.  evidence of who used, owned, or controlled the electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, correspondence, and phonebooks;

i.  evidence indicating how and when the electronic storage media were accessed or used to determine the chronological context of electronic storage media access, use, and events relating to crime under investigation and to the electronic storage media user;

j.  evidence indicating the electronic storage media user's state of mind as it relates to the crime under investigation;

k.  evidence of the attachment to an electronic storage medium of another storage device or similar container for electronic evidence;

4

l. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage media;

m. evidence of the times the electronic storage media were used;

n. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage media;

o. documentation and manuals that may be necessary to access the electronic storage media or to conduct a forensic examination of the electronic storage media;

p. records of or information about Internet Protocol addresses used by the electronic storage media;

q. records of or information about the electronic storage media's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

r. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, videotapes, motion pictures, or photocopies). This shall include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications;

5

reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the computer, electronic device, or other storage medium.

6

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Gregory Lipner, being first duly sworn, hereby deposes and states as follows:

### I.    INTRODUCTION AND AGENT BACKGROUND

1.    Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises (hereinafter the "**Subject Premises**"), in order to search for and seize the items outlined in Attachment B, which represent evidence, fruits, and/or instrumentalities of the criminal violations further described below:

   a. 3958 E. Main Street, Mesa, Arizona 85205, (**Subject Premises A-1**), as further described in Attachment A-1;

   b. 9648 E. Lobo Avenue, Mesa, Arizona 85209 (**Subject Premises A-2**), as further described in Attachment A-2;

   c. 2020 GMC Sierra, VIN ending in -8982, Arizona Plate AZGUNZ (**Subject Vehicle A-3**), as further described in Attachment A-3;

   d. 2009 GMC Canyon, VIN ending in -4739, Arizona Plate ZAA3EA (**Subject Vehicle A-4**), as further described in Attachment A-4;

   e. 2019 Chevrolet Corvette, VIN ending in -2355, AZ Plate X3A57B (**Subject Vehicle A-5**), as further described in Attachment A-5; and

   f. 2020 JEEP Grand Cherokee, VIN ending in -5666, Arizona Plate BDZ3619 (**Subject Vehicle A-6**), as further described in Attachment A-6.

2.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since March 2018. Prior to joining ATF, I worked for the United States Secret Service (USSS), first in the Uniformed Division from June 2008 until August 2016, and then as a Special Agent from August 2016, until joining ATF as a Special Agent in 2018. I completed the Criminal Investigator Training Program and the ATF Special Agent Basic Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. Upon graduation from FLETC, I was assigned to the ATF

Phoenix Field Division and tasked with investigating illegal firearms trafficking. I am familiar with federal law as it pertains to firearms and ammunition. I have conducted investigations, which have resulted in the arrest and conviction of individuals as well as searches and seizures of property. During the course of my career with ATF, I have conducted and/or participated in investigations involving, but not limited to: straw purchasing of firearms, interstate firearms trafficking, international firearms trafficking, felons in possession of firearms, cellular telephone tracking warrants, vehicle tracking warrants, call detail records, historical cellular site data, cellular telephone downloads, video/audio/physical surveillance, search warrants, arrest warrants, and undercover operations.

3.     The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; analysis of public records; controlled purchases of firearms and ammunition; analysis of subpoena compliance; information derived from interviews; and through other reliable sources of information relative to this investigation.

4.     Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

## II.     PROBABLE CAUSE
### Background on Straw Purchasing

5.     Transnational Criminal Organizations operating in Mexico, oftentimes referred to as Mexican Cartels, rely upon the use of firearms to protect their supply of drugs, supply routes, profits, and distribution territory from both law enforcement and competing Cartels.

2

6.     Mexican Cartels represent a ready and lucrative market for firearms from the United States. Mexican Cartels prefer certain makes, models, and calibers of firearms. These "weapons of choice" include but are not limited to: AK-47 type rifles and pistols, AR-15 type rifles and pistols, and 9X19mm caliber pistols. Mexican Cartels desire these types of firearms because they are: (1) capable of accepting high-capacity magazines; (2) rugged and durable in extreme conditions such as deserts and jungles; and (3) easily convertible to automatic, meaning the firearm will continue to fire more than one round, without manually reloading, by a single function of the trigger.

7.     These firearms are not available in Mexico through regular commercial retail channels but are available in the United States through licensed retail gun stores. Therefore, Mexican Cartels rely on the commercial firearms market from the United States, among other places, to supply their paramilitary members. Firearms traffickers commonly purchase the firearms they smuggle into Mexico from licensed retail gun stores in the United States. Because of their unavailability in Mexico, these firearms are worth significantly more in Mexico than in the United States.

8.     A Federal Firearms Licensee (FFL) is a business licensed under Chapter 44 of Title 18, United States Code, to engage in the business of dealing in firearms. When a purchaser buys a firearm from an FFL, that buyer must fill out Section B of ATF Form 4473 (Firearms Transaction Record), which asks for and requires the purchaser's true name, current state of residence and address, and other identifying information.[1] Section B also requires the purchaser to affirmatively attest to several questions, which are ultimately used to determine if they are legally eligible to possess firearms. Section B states: "**Must Be Completed Personally By Transferee/Buyer**". Both the purchaser and the transferer are required to sign the form certifying that they have read and understand the notices, instructions, and definitions, and that their answers are true, correct, and complete. The

---

[1] ATF Form 4473 (5300.9) Revised May 2020. Earlier versions of the form may differ slightly in structure or verbiage.

transferer also certifies that the entire transaction record has been completed at the licensed business premises. The information on the ATF Form 4473 makes it possible to trace a firearm back to its retail purchaser. FFLs are required by Chapter 44 of Title 18, United States Code, to maintain these forms in their records. In addition, ATF Form 4473 asks the purchaser:

> Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuations sheet(s)? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you...**"

9.     If the individual filling out an ATF Form 4473 is not the actual purchaser of the firearm(s) but is instead purchasing the firearm(s) on behalf of another person, the transaction is colloquially known as a "straw purchase." Firearms traffickers often employ "straw purchasers" to buy firearms from FFLs in the United States. When a straw purchase takes place, the identity of the true purchaser is concealed. Straw purchasers are commonly paid to falsely claim on the ATF Form 4473 that they are buying the firearm(s) for themselves, when in fact they are purchasing the firearm(s) on behalf of another. Firearms purchased in furtherance of a firearms trafficking conspiracy are sometimes purchased in cash to further conceal the true buyer and source of funds. Firearms traffickers commonly employ multiple straw purchasers to ensure that they have more than one source of firearms and to avoid detection by law enforcement.

10.     If an FFL, or employee of an FFL, knows that the individual filling out an ATF Form 4473 is not the actual purchaser of the firearm(s) but is instead purchasing the firearm(s) on behalf of another person, it is illegal for the FFL or an employee to sell the firearm(s) to that individual. FFLs are required to sign an Acknowledgement of Federal Firearms Regulations upon receiving their license and during every routine inspection. Straw purchasing and ATF Form 4473 procedures are some of the topics explained to the FFL each time the form is signed.

4

### Case Initiation

11.     In May 2020, the ATF Phoenix Crime Gun Intelligence Center opened a case on Hector CAMARENA-BEDOY (CAMARENA) because he purchased 28 firearms from **American Guns & Ammo** from about April 2020 to May 2020, in three transactions. CAMARENA also purchased multiple firearms from Tombstone Tactical, another FFL in Phoenix. Most of the firearms purchased were duplicates or of a similar make, model, or caliber.

12.     Al's American Guns & Ammo LLC dba **American Guns & Ammo** is currently licensed by ATF as a federal firearms dealer (License No. 9-86-013-01-4H-08389, Expiration August 1, 2024), and as a federal firearms importer (License: 9-86-013-08-2A-14613, expiration January 1, 2022).

13.     Albert Moses COURY III (COURY), is listed in ATF records as the sole responsible person for **American Guns & Ammo. American Guns & Ammo** is located at **Subject Premises A-1. American Guns & Ammo** has no other licensed business premises. According to ATF records, COURY has signed three Acknowledgement of Federal Firearms Regulations since **American Guns & Ammo** was licensed.

14.     COURY is also the sole responsible person for an additional FFL in Arizona. Al's Guns & Ammo LLC dba Al's Guns & Ammo is currently licensed by ATF as a federal firearms dealer (License: 9-86-013-01-4A-07944, Expiration: January 1, 2024). Al's Guns & Ammo is located at **Subject Premises A-2.** Al's Guns & Ammo has no other licensed business premises.

15.     In June 2020, ATF conducted a preliminary interview of CAMARENA, who admitted to straw purchasing firearms for Jose Antonio SANTEROS-PLACSENCIA (PLACSENCIA). In January 2021, ATF conducted a follow up interview with CAMARENA, who admitted to straw purchasing a total of 54 firearms for PLACSENCIA from about January 2020 to June 2020. CAMARENA stated that PLACSENCIA claimed he (PLACSENCIA) was trafficking the firearms to Mexico concealed in the spare tire of his vehicle. After discussing the three transactions at **American Guns & Ammo,**

5

CAMARENA stated he did not fill out the ATF Form 4473 for any of them. CAMARENA stated that COURY presented the forms to him prefilled with his information. CAMARENA stated that PLACSENCIA initially introduced him to COURY. CAMARENA stated COURY would point to the form and tell him where to sign during the transactions. Of the three transactions, CAMARENA stated he only signed two of the ATF Forms 4473 and did not sign the form dated May 1, 2020. According to CAMARENA, COURY told him during two of the transactions not to pay for the firearms, but to have PLACSENCIA give him cash later.

16.    Your Affiant reviewed the third ATF Form 4473. The signature does not look like CAMARENA's signature from the other two forms. The images below show CAMARENA's known signature (top) versus the signature in question (bottom):

prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 12.d.2, and provides the documentation required in 18.c. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law. *(See Instructions for Question 14.)*

| 14. Transferee's/Buyer's Signature | 15. Certification Date |
| --- | --- |
|  | 04-07-2020 |
| Section B - Must Be Completed By Transferor/Seller | |

18.c. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law. *(See Instructions for Question 14.)*

| 14. Transferee's/Buyer's Signature | 15. Certification Date |
| --- | --- |
|  | 05-01-2020 |
| Section B - Must Be Completed By Transferor/Seller | |

17.    According to a law enforcement database, PLACSENCIA crossed from Mexico into the United States approximately 30 times in 2020. One of the vehicles PLACSENCIA crossed the border in was registered to his mother Lourdes SANTEROS (SANTEROS).

18.    In November 2020, another FFL, Tombstone Tactical, contacted ATF and stated that PLASCENCIA had visited their store to buy several inexpensive firearms commonly requested by suspicious purchasers. Tombstone Tactical stated they denied the

6

sale because PLASCENCIA could not provide proper identification. Several hours later, an unidentified individual with PLASCENCIA's last name visited the store and attempted to purchase the same firearms. Tombstone Tactical advised that they denied the sale because it appeared to be an obvious straw purchase.

19.    On November 28, 2020, Tombstone Tactical received an online transfer order from PLACSENCIA for seven firearms to be shipped from Tombstone Tactical to **American Guns & Ammo**. Tombstone Tactical emailed PLASCENCIA and requested that he come into their store to transfer the firearms. PLASCENCIA responded to the email stating he would rather have the firearms transferred to **American Guns & Ammo** because a store employee at Tombstone Tactical was rude to him. On December 1, 2020, PLASCENCIA emailed Tombstone Tactical and requested that the order be cancelled. Tombstone Tactical stated they contacted **American Guns & Ammo** to warn them about potential straw purchasing activity involving PLACSENCIA.

20.    On February 8, 2021, ATF stopped and interviewed PLACSENICA after he departed Tombstone Tactical. During the interview, PLACSENICA denied all illegal firearms trafficking activity.

21.    In March 2021, ATF visited **American Guns & Ammo** to obtain a copy of the ATF Form 4473 for firearms purchased by PLACSENCIA. COURY advised that his records (including ATF Forms 4473) are digital. COURY attempted to look for the form. COURY called and sent a text message to an employee of the store via a cellular telephone, Natalie Louise TURNER (TURNER), who ultimately had the form offsite.

22.    Based on law enforcement databases and other sources, your Affiant knows that COURY and TURNER reside at **Subject Premises A-2** together. In addition, from November 10, 2020, to June 15, 2021, COURY crossed from Mexico into the United States approximately three times at the CBP Lukeville Port of Entry. During those border checks, TURNER was listed as a passenger of the vehicle. During the interview with ATF, COURY described TURNER as his "wife without papers."

7

23.    ATF showed COURY a picture of PLACSENICA, who COURY was able to identify. COURY stated that he believed PLACSENCIA or PLACENCIA's father owned a security company in Mexico. COURY stated that he met PLACSENICA's mother and wife but did not recall seeing him with anyone else. ATF observed TURNER arrive at the store carrying several boxes of what appeared to be paperwork. COURY provided ATF with a copy of the ATF Form 4473 for the purchase of two firearms by PLACSENCIA on January 13, 2021.

24.    ATF showed COURY a photograph of CAMARENA. COURY stated that CAMARENA looked like one of three people who had previously visited his store. COURY initially stated that he had never seen CAMARENA and PLASCENCIA in the store together, but then altered his statement, saying that he did not know if he had seen them together. ATF asked if PLACSENCIA frequented the store. COURY stated that PLACSENCIA had visited his store approximately five to ten times and had stopped by a couple of weeks ago. ATF asked COURY about the nature of PLACSENCIA's visits. COURY stated that PLACSENCIA typically comes in to talk. COURY stated that he (COURY) collects rare bottles of alcoholic beverages and PLACSENCIA had given him one as a gift. COURY also stated that PLACSENCIA brought tamales to the store as a gift.

25.    COURY stated that PLACSENICA had visited the store with his mother (SANTEROS) and girlfriend. During the conversation, COURY mentioned that SANTEROS made a "pretty hefty order" of firearms that he thought might have been for their security business in Mexico. COURY stated that he had asked the owner of the shopping plaza if people are allowed to take firearms from the United States into Mexico and was told that there was paperwork that would allow it. ATF requested the ATF Forms 4473 for SANTEROS's purchases. COURY stated there was only one purchase for 10 firearms.

26.    ATF later learned that SANTEROS purchased 28 firearms from **American Guns & Ammo** during three transactions within 14 days.

8

27. ATF asked COURY about the process for completing ATF Forms 4473 at the store. COURY stated that he uses a "cheat sheet" to walk customers through filling out the form to make things "easy." COURY identified an in-store computer terminal that customers use to complete the ATF Forms 4473. COURY stated that after they (presumably the customer) finish filling out the form, it is printed out, and the customer applies a wet signature. ATF asked COURY if he auto-populates the form for repeat customers. COURY stated that the forms must be completed each time because "they" (presumably ATF) do not want the forms to be auto populated. COURY stated that he can relate because he would not want his information to be auto populated. ATF told COURY that PLACSENCIA was suspected of illegally trafficking firearms and had several people working for him. COURY stated that he only recalled SANTEROS purchasing firearms with PLACSENCIA.

28. In April 2021, ATF interviewed SANTEROS. SANTEROS admitted to straw purchasing firearms for her son (PLACSENCIA) on one occasion. SANTEROS stated that PLACSENCIA told her he was unable to purchase the firearms for himself because he did not have identification. When SANTEROS asked PLACSENCIA why he needed so many firearms, PLACSENCIA told her he needed them to go hunting.

29. According to the three ATF Forms 4473, SANTEROS was delayed by the National Instant Criminal Background Check System (NICS) on two of the forms. This information suggests that SANTEROS visited **American Guns & Ammo** on five different dates to complete the three transactions. However, SANTEROS claimed she only went to **American Guns & Ammo** one time.

30. Your Affiant reviewed the signatures on the three ATF Forms 4473 for these transactions. It appears that SANTEROS's signature from the first form (which she admitted to signing) does not match the signature on the two later ATF Forms 4473. The images below show SANTEROS's known signature (top) on an ATF Form 4473 from **American Guns & Ammo** versus the two other signatures in question (bottom two) from **American Guns & Ammo**:

9

transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law. (See Instructions for Question 14.)

| 14. Transferee's/Buyer's Signature | 15. Certification Date |
|---|---|
| | 10/02/2020 |

Section B - Must Be Completed By Transferor/Seller

transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law. (See Instructions for Question 14.)

| 14. Transferee's/Buyer's Signature | 15. Certification Date |
|---|---|
| | 10-09-2020 |

Section B - Must Be Completed By Transferor/Seller

transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law. (See Instructions for Question 14.)

| 14. Transferee's/Buyer's Signature | 15. Certification Date |
|---|---|
| | 10-16-2020 |

Section B - Must Be Completed By Transferor/Seller

31.    In June 2021, PLACSENCIA contacted ATF and agreed to be interviewed. During the interview, PLACSENCIA admitted to recruiting CAMARENA, SANTEROS, Bethany Lynn MONTOYA-MAYVILLE (MAYVILLE), and a person only identified as "Ashley" to straw purchase firearms for PLACSENCIA. PLACSENCIA stated the firearms were purchased on behalf of a high-ranking member of the Arellano Cartel based out of Tijuana, Baja California, Mexico. The Arellano Cartel is a Transnational Criminal Organization involved in drug and firearms trafficking.

32.    ATF questioned PLACSENCIA about CAMARENA and if they were ever in **American Guns & Ammo** together. PLACSENCIA stated he only went to **American Guns & Ammo** with CAMARENA on one occasion. PLACSENCIA stated the first order that he purchased was online from **American Guns & Ammo**. PLACSENCIA stated that he could not remember if he ordered the firearms online under his name or CAMARENA's name. PLACSENCIA stated that CAMARENA told him he received a telephone call from someone at **American Guns & Ammo** stating that the firearms were ready to be picked up. PLACSENCIA stated that when CAMARENA went to the store, the firearms were not there. PLACSENCIA stated he was upset so he sent **American Guns & Ammo** an email complaining. PLACSENCIA stated he immediately received a telephone call from

10

COURY who claimed there were no orders in his name. PLACSENCIA stated that he told COURY the order was for his brother and someone from the store had called claiming the firearms were ready for pick up. PLACSENCIA stated that COURY told him no one from the store had called, but he agreed to provide an update when the guns arrive. PLACSENCIA stated this is how his relationship started with COURY. ATF asked PLACSENCIA to explain how someone other than CAMARENA may have signed the form. PLACSENCIA stated he did not sign for CAMARENA and that PLACSENCIA did not have another person pretend to be CAMARENA.

33.    ATF questioned PLACSENCIA about how many times SANTEROS had purchased firearms on his behalf. PLACSENCIA stated that SANTEROS only purchased firearms for him one time. However, PLACSENCIA admitted to purchasing additional firearms from **American Guns & Ammo** under SANTEROS's name without her knowledge. PLACSENCIA stated that, during one purchase of firearms, he told an employee of **American Guns & Ammo** that SANTEROS may have COVID and was waiting outside in the car. PLACSENCIA initially stated that he took the ATF Form 4473 to the car to be signed, but then changed his statement and said that the employee took the form outside to the car. PLACSENCIA stated he could not remember which employee went to the car. PLACSENCIA stated that a person that he only identified as "Ashley" wore a face mask and forged SANTEROS's signature on the ATF Form 4473. PLACSENCIA then confirmed that "Ashley" signed the two forms representing herself as SANTEROS, dated October 13, 2020, and October 16, 2020. According to the form dated October 13, 2020, Ashley, representing herself as SANTEROS, initially signed the form on October 9, 2020, and the sale was delayed by NICS. SANTEROS did not receive a proceed from NICS until October 10, 2020. The form was then signed again on October 13, 2020, when the firearms were allegedly transferred. PLACSENCIA stated that while Ashley signed the form representing herself as SANTEROS, PLACSENCIA and Ashley only went to **American Guns & Ammo** once (and not twice) to complete that particular transaction. PLACSENCIA stated that he had a photograph of SANTEROS's identification

11

on his cellular telephone. PLACSENCIA stated that he believed that he texted that photograph to COURY.

34.    ATF showed PLACSENCIA a photograph of COURY, which he positively identified. PLACSENCIA stated that COURY would send him text messages when COURY received shipments of new inventory. PLACSENCIA stated he would send text messages to COURY ordering firearms for others to pick up. PLACSENICA denied that COURY had any direct knowledge about PLACSENICA'S straw purchases.

35.    In July 2021, ATF interviewed MAYVILLE who admitted to straw purchasing 52 firearms for PLACSENCIA. When questioned about **American Guns & Ammo**, MAYVILLE stated she filled out the ATF Form 4473 on her first visit, but the form was presented to her already filled out each subsequent visit. MAYVILLE stated she has purchased guns since 2010 and found it suspicious that **American Guns & Ammo** did not require her to fill out the form for every purchase like other gun stores. MAYVILLE stated COURY told her she did not need to fill out the form again because her information was on file.

36.    MAYVILLE stated PLACSENCIA told her to ask for COURY at **American Guns & Ammo** and that she only dealt with COURY during the transactions. Despite a NICS delay and/or different order/transfer dates on the same form, MAYVILLE stated she went to the store one time per transaction and never left without guns. ATF presented MAYVILLE with the ATF Form 4473 from **American Guns & Ammo**, dated August 5, 2020. MAYVILLE confirmed her two signatures on the form. ATF explained that according to the form, MAYVILLE was in the store on July 30, 2020, but was delayed by NICS so she left the store without the guns, and then returned on August 5, 2020, to pick up the guns. ATF asked MAYVILLE if the transaction happened the way that the form indicated. MAYVILLE stated she never went to **American Guns & Ammo**, got delayed, and had to go back. MAYVILLE again stated there was never a time when she went to the **American Guns & Ammo** and left without guns.

12

37. MAYVILLE described a transaction where PLACSENCIA gave her an envelope of cash and told her to go to **American Guns & Ammo** to pick up firearms. MAYVILLE stated she did not count the money beforehand and gave it directly to COURY. MAYVILLE stated that COURY told her she was short money. MAYVILLE stated she tried calling PLACSENICA, but he did not answer. MAYVILLE stated she texted PLACSENCIA to tell him about the money and figure out what to do. MAYVILLE stated COURY told her not to worry about it and he will get the money from PLACSENCIA later. MAYVILLE stated that COURY asked her how she got mixed up in this situation. MAYVILLE stated that she told COURY she was PLACSENCIA's girlfriend. MAYVILLE stated she asked COURY if she could get in trouble for buying guns that her boyfriend was keeping. MAYVILLE stated that COURY told her no because they were for her boyfriend. MAYVILLE stated she specifically asked COURY if she would get in trouble because PLACSENICA was not there. MAYVILLE stated COURY told her no because the guns were in her name, and they were a couple.

38. MAYVILLE described another transaction where PLACSENCIA did not send her enough money through Venmo for the firearms. MAYVILLE stated COURY told her he would float a couple of guns to her and have PLACSENICA pay him later. MAYVILLE stated the guns the owner floated to her were allegedly for PLACSENICA's birthday. MAYVILLE stated it had nothing to do with her even though the guns were in her name. MAYVILLE stated again that she told COURY she did not have enough money due to a card limit, so he told her he would give her the guns anyway and take it up with PLACSENICA later.

39. MAYVILLE stated she asked COURY how he knew PLACSENICA because they seemed to know each other on a personal level. MAYVILLE stated that COURY told her he fell for PLACSENICA right away because he reminded him of a younger version of himself: young, dumb, and always getting into trouble. Of the five transactions from **American Guns & Ammo**, MAYVILLE ultimately stated she only signed four of the forms. Your Affiant reviewed the signatures on the ATF Forms 4473 for

13

MAYVILLE. The signature on the form dated July 15, 2020, does not appear match MAYVILLE's prior signatures. The images below show MAYVILLE's known signature (top) on an ATF Form 4473 from **American Guns & Ammo** versus the signature in question (bottom) from **American Guns & Ammo**:

40.    MAYVILLE provided ATF with text message conversations she had with PLACSENCIA. MAYVILLE was only able to retrieve text messages back to June 18, 2020. A selection of relevant exchanges follows:

**July 16, 2020**

PLACSENCIA: "I need you to go to Mesa [emoji]"

PLACSENCIA: "Everything is done and paid for you'll be in and out I'll give you gas money"

MAYVILLE: "Lol. Can't do it today. but I have to drop a friend off at the airport tomorrow. I think I gotta have her there at 9.. so maybe after that."

MAYVILLE: "And you'd have to pay my gas. I'm so broke [emoji] still fighting unemployment. At this rate, might be moving into toy hauler again instead of house. [emoji][emoji] for reals."

**July 17, 2020** (Transfer date to MAYVILLE at **American Guns & Ammo**)

PLACSENCIA: "Morning. I sent you $1000 When you have the chance the make it to Mesa $900 is for Al. $100 is for you. Thanks babe."

MAYVILLE: "Ok babe. What's the address again? Or the name of the place?"

PLACSENCIA: [Map link for American Guns and Ammo]

MAYVILLE: "Bank will let me take out 600"

PLACSENCIA: "That's fine"

PLACSENCIA: "Give him the other 3 on your card babe"

MAYVILLE: "Ok"

MAYVILLE: "Am I bringing these to your work?"

14

MAYVILLE:    "Leaving here now"

PLACSENCIA:  "If you can"

PLACSENCIA:  "I get that you have a million other things going on"

MAYVILLE:    "Not right now I don't.."

MAYVILLE:    "And Jesus.. why is every guy that works there hot af?!? [emoji][emoji]"

**August 5, 2020** (Transfer date to MAYVILLE at **American Guns & Ammo**)

MAYVILLE:    "What's the place called?"

PLACSENCIA:  "American gun and ammo"

MAYVILLE:    "I just left my house but google mapped it and there's no way I'll be there by 4. It would be like 415 [emoji]"

PLACSENCIA:  "Ill let him know you're on your way"

MAYVILLE:    "Will he stay open for me?? If so I'll haul ass"

PLACSENCIA:  "Yea"

MAYVILLE:    "Is it all paid for already?"

PLACSENCIA:  "Yes dear"

MAYVILLE:    "Lol.. my phone is at 5% and my car charger just broke [emoji]"

MAYVILLE:    "So just wanted to make sure I didn't need my phone"

MAYVILLE:    "Did you tell them I was on my way?"

PLACSENCIA:  "Yea why"

MAYVILLE:    "They're not answering their door"

MAYVILLE:    "And it's all locked up"

PLACSENCIA:  "Is there a truck outside. GNC"

PLACSENCIA:  "GMC"

MAYVILLE:    "They let me in finally.. lol"

MAYVILLE:    "These fkin guys [emoji][emoji]"

PLACSENCIA:  "What"

MAYVILLE:    "He's just hilarious.."

MAYVILLE:    "I'm hauling ass home. Internet guy coming back at 5 cus the first guy didn't have the shit he needed."

**August 14, 2020** (Transfer date to MAYVILLE at **American Guns & Ammo**)

MAYVILLE:    "Ummm he said you shorted him 100"

MAYVILLE:    "3250"

PLACSENCIA:  "How much is in there ? 3250"

MAYVILLE:    "You have gave me 3150"

PLACSENCIA:  "Shit"

MAYVILLE:    "I ya e him the envelope and don't even count it. So whatever was in it is what you put in it"

MAYVILLE:    "Gave*"

PLACSENCIA:  "I counted it super fast."

PLACSENCIA:  "Tell him I'll swing it by. Lol I'm good for it"

15

**August 21, 2020** (Transfer date at **American Guns & Ammo**)

MAYVILLE: "Pfttt Al sure is nice.. he gave you a gun for your birthday?? Ima have to start ha gong out with him. He's nicer than you [emoji][emoji]"

MAYVILLE: "Hanging*"

PLACSENCIA: "Hahaha He's the best. But I'm over paying for all the other ones. Lol"

MAYVILLE: "Blah blah blah.. he told me today "damn, nice outfit.. I mean I'm not looking but I am cus your girls are lookin at me" [emoji][emoji][emoji][emoji]"

MAYVILLE: "Am I bringing these to your work?"

PLACSENCIA: "Babe I'm at home"

PLACSENCIA: "Can you bring them here or want me to meet you somewhere"

41.    Based on this investigation, ATF believes that, when questioned by ATF about his activities, COURY was concealing information about known associates who straw purchased firearms for PLACSENICA and the true manner in which ATF Forms 4473 are processed by COURY, TURNER, and/or other employees under COURY's supervision at **American Guns & Ammo**.

## UNDERCOVER INVESTIGATION

42.    In September 2021, ATF initiated an undercover investigation into **American Guns & Ammo** and COURY.

### Undercover Purchase #1

43.    On September 17, 2021, Undercover Agent (UCA) UCA-6426 conducted a controlled purchase of 800 rounds of ammunition for $1,000 from COURY from **American Guns & Ammo**. At the conclusion of the transaction, COURY test drove UCA-6426's vehicle. During the test drive, COURY conducted several burnouts in the vehicle and commented on how he is known by the Mesa Police Department and his family donates a ton of money to them.

## Undercover Purchase #2

44.     On September 24, 2021, UCA-6426 conducted a controlled purchase of 920 rounds of ammunition for $1,000 from COURY from **American Guns & Ammo**. During the transaction, UCA-6426 asked COURY about the Glock pistols that COURY had for sale. COURY showed UCA-6426 several Glock 9X19mm caliber pistols. UCA-6426 held and manipulated several of the firearms. COURY asked UCA-6426 when UCA-6426 would be interested in buying a firearm. UCA-6426 informed COURY that UCA-6426 was interested in making a purchase the following week. COURY told UCA-6426 to stop by **American Guns & Ammo** on Wednesdays or Thursdays so UCA-6426 could deal directly with COURY.

## Undercover Purchase #3

45.     On September 29, 2021, UCA-6426 conducted a controlled purchase of 1,200 rounds of ammunition for $1,500 from COURY from **American Guns & Ammo**. UCA-6426 introduced COURY to a UCA, UCA-1279, during the transaction. UCA-6426 asked COURY if he had any Taurus pistols for sale. COURY stated he did not have any in stock and recommended other firearms to UCA-6426. COURY asked UCA-6426 several questions about how UCA-6426 planned to carry the firearm. UCA-6426 gave COURY inconclusive responses. COURY ultimately told UCA-6426 to go and test fire several firearms and call when UCA-6426 decided what UCA-6426 liked. COURY provided UCA-6426 with his cellular telephone number XXX-XXX-6305.

46.     According to grand jury subpoena compliance provided by Cellco Partnership dba Verizon Wireless, telephone number XXX-XXX-6305 is currently subscribed to COURY and was activated on July 20, 2012. The equipment was described as an iPhone 11 Pro Max Green with an International Mobile Equipment Identity (IMEI) ending in x5433.

47.     Based on COURY's toll records and a law enforcement database query, ATF believes that cellular telephone number XXX-XXX-5938 is used by TURNER and it appears that TURNER's number is listed as an additional line on COURY's account.

17

48.    During October 2021, UCA-6426 contacted COURY on the cellular telephone number that COURY provided. UCA-6426 corresponded with COURY through text messages and telephone calls.

49.    On October 20, 2021, UCA-6426 texted COURY and stated that UCA-6426 would "be in the area tomorrow" and "wanted to see what [COURY] ha[d] available." Twenty minutes later, UCA-6426 received a telephone call from COURY stating he will be out of town in California for a funeral service and will not be back until next week.

50.    On November 2, 2021, UCA-6426 corresponded with COURY via text message:

UCA-6426:    "Buenos días Al, it's [UCA-6426] from Tucson. If you are going to be at the store tomorrow I'll stop by with my cousin. I want to grab a few of the glocks you have."
UCA-6426:    "I'll be in the area around 2pm"
COURY:    (Two thumbs up emojis)

51.    On November 3, 2021, UCA-6426 and UCA-5909 went to **American Guns & Ammo**, but COURY was not present. They departed without making any purchases.

### Undercover Purchase #4

52.    On November 16, 2021, UCA-6426 and UCA-5909[2] entered **American Guns & Ammo** to meet with COURY. An unidentified employee told UCA-6426 that COURY was busy so UCA-6426 and UCA-5909 departed the store. UCA-6426 sent COURY the following text message: "The guys said your busy. Im going to grab something to drink. Let me know when youre available and ill drop by."

53.    Approximately 40 minutes later, UCA-6426 and UCA-5909 arrived back at **American Guns & Ammo**, met with COURY in the parking lot, and walked inside. COURY read UCA-6426's last text message aloud and apologized for being busy. UCA-

---

[2] This UCA is different than the UCA who accompanied UCA-6426 on September 29, 2021.

6426 asked COURY if he had any Glocks. COURY asked UCA-6426 what UCA-6426 was looking for. COURY showed UCA-6426 and UCA-5909 several firearms. UCA-5909 asked COURY about one of the tiffany-blue colored firearms. COURY asked UCA-5909 if the firearms were for UCA-5909, UCA-6426, or both. UCA-5909 told COURY that they were for UCA-5909 and UCA-5909's whole family.

54.    While looking up the price for a Glock 17 per UCA-6426's request, COURY asked if the payment would be cash or charge. UCA-6426 stated, "Cash."

55.    UCA-6426 asked COURY if UCA-6426 could get five of the Glock 17 pistols. COURY told UCA-6426 that he would check how many he had in inventory. COURY told UCA-6426 that he only had one in stock and would have to order the rest. COURY told UCA-6426 that he could possibly have them in stock by Thursday (November 18, 2021) or Friday (November 19, 2021).

56.    UCA-6426 told COURY that UCA-6424 is going out of town and asked COURY if he had any Glock 19's in stock. COURY said that he would go and check in the back. COURY came back and stated he did not have any Glock 19's in stock. UCA-6426 asked COURY about any other Glock 17's in stock. COURY ultimately showed UCA-6426 and UCA-5909 three Glock 17's, a Glock 45, and a Glock 34.

57.    UCA-6426 asked COURY for a total price. UCA-6426 and UCA-5909 discussed if they wanted to proceed with the purchase. COURY told UCA-6426 that UCA-6426 was going to empty their inventory and he had not even started the week. COURY then called "Kevin" to come and watch the firearms while COURY went to one of the computers to calculate the total. COURY explained to UCA-6426 and UCA-5909 that the ATF requires him to have an employee watch the firearms while he walks away from the counter. After a few minutes COURY informed UCA-6426 that the price for the firearms would be $3,550.

58.    UCA-6426 and UCA-5909 walked over to the desk in front of COURY to begin the paperwork process. UCA-5909 sat in front of COURY and UCA-6426 stood next to the desk observing the entire transaction. UCA-5909 provided COURY with UCA-

19

5909's identification. UCA-5909 asked COURY if he needed UCA-5909's social security number. COURY declined and told UCA-5909 that he was going to do a quick "cheat sheet" and run the background check. UCA-6426 observed COURY take out a paper copy of the ATF Form 4473 and fill it out by hand with UCA-5909's information. COURY also answered "Yes" to Question 21.a, which asks whether UCA-5909 is the actual purchaser of the firearm and "No" to Question 21b-k, which address facts that would disqualify the purchaser from buying the firearm(s). COURY asked UCA-5909 for her telephone number, which COURY then wrote on the form. COURY also asked UCA-5909 if UCA-5909 was Hispanic or non-Hispanic, Hispanic white, and the city, state, or country where UCA-5909 was born. COURY explained to UCA-5909 that "they" (possibly referring to the ATF) just want to know where you were born and all that matters is that you are a United States Citizen. COURY then gave UCA-5909 the ATF Form 4473 that COURY had already filled out. COURY told UCA-5909 that he wanted to make sure all the questions were answered properly and asked UCA-5909 to sign the form.

59.    As UCA-5909 reviewed the form that was completed by COURY, UCA-5909 stated that there are a lot of questions on the form. COURY offered to read the questions to UCA-5909. UCA-5909 told COURY that UCA-5909 may need COURY to do so. UCA-6426 told UCA-5909 in front of COURY that the form is not a mortgage, and UCA-5909 did not need to worry about it. COURY lowered his voice and told UCA-5909 that he just did this (filled out the form on UCA-5909s behalf) because of [UCA-6426] (COURY pointed at UCA-6426). COURY provided a quick summary of the disqualifying questions to UCA-5909. UCA-5909 then signed the form. Using a cellular telephone, COURY took a photograph of the signed ATF Form 4473, a photograph of UCA-5909's identification, and a photograph of the firearms tags with his cellular telephone. COURY told the UCAs that he was going to text the photographs to Natalie (referring to TURNER) because she types faster than he does.

60.    ATF believes that, on this date, TURNER was working from her home, which is **Subject Premises A-2**. ATF has conducted surveillance on **Subject Premises A-**

20

2 on four occasions, and ATF has never seen TURNER leave the **Subject Premises A-2** by car or on foot.

61.    One of the employees approached the desk and asked COURY if he needed a background check run. COURY replied that Natalie (referring to TURNER) was doing it. COURY told UCA-5909 that the total is $3,550.00. UCA-6426 asked if UCA-6426 could add a box of ammunition to the order. COURY told UCA-6426 that he would sell the box of ammunition for an even $250 because he does not charge UCA-6426 tax. UCA-6426 asked COURY for the total price. COURY replied that it would be $3,800. UCA-6426 removed cash from UCA-6426's pocket and paid COURY $3,800 for the firearms and ammunition.

62.    After several minutes, an employee brought COURY several documents. COURY told UCA-5909 that one was the background check, and the other was the "cheat sheet" that UCA-5909 had already signed. COURY asked UCA-5909 also to sign and date the electronically filled form that had been printed out. UCA-6426 observed COURY give UCA-5909 a typed copy of the ATF Form 4473. UCA-5909 signed and dated the typed copy of the ATF Form 4473 as instructed by COURY.

63.    COURY provided UCA-5909 with the receipt and UCA-6426 took the box with the firearms. COURY told UCA-6426, "Thank you for your loyalty, young [UCA-6426]." UCA-6426 and UCA-5909 walked out of the store and departed the parking lot. Approximately 45 minutes after UCAs departure, COURY sent a text message to UCA-6426 stating, "Thank you again for your loyalty and business. :)" UCA-6426 responded by stating, "Thank you, i'll be back next week. I need to get some other things." COURY texted a response to UCA-6426 with two thumbs up emojis and an emoji with sunglasses.

### Undercover Purchase #5

64.    On December 3, 2021, UCA-6426 and UCA 5909 entered **American Guns & Ammo** to meet with COURY. An employee told UCA-6426 that COURY was busy so UCA-6426 and UCA-5909 departed. UCA-6426 had the following text message conversation with COURY:

| UCA-6426: | "Hey Al, are you in today? What deal can you give me on the Draco you gave on display?" |
|---|---|
| COURY: | "Yep. Let me ck" |
| COURY: | "9mm?" |
| UCA-6426: | "I thought it was 762 the ak one" |
| UCA-6426: | "Is it 9?" |
| COURY: | "Nope. 9mm sorry" |
| UCA-6426: | "Ok, im interested" |
| UCA-6426: | "Do you still have some glocks 9 available?" |
| COURY: | (Picture of a computer screen showing $800 for the Draco) |
| UCA-6426: | "Ok, im going to grab that one." |
| COURY: | Thumbs up emoji |

65.    UCA-6426 and UCA-5909 arrived at **American Guns & Ammo**. After a few minutes inside the store, UCA-6426 and UCA-5909 went back outside. Shortly after, COURY walked outside and greeted UCA-6426 and UCA-5909. COURY informed UCA-6426 that he was busy making funeral arrangements for a family member who had recently passed away. COURY then asked UCA-6426 if the gun was going to be under UCA-6426's name or under UCA-5909's name. UCA-6426 told COURY that the firearm would be under UCA-5909's name. COURY then asked UCA-5909 for UCA-5909's driver's license. COURY offered UCA-6426 to have "Kevin" show UCA-6426 some Glocks. UCA-6426 told COURY that UCA-6426 would just take the Draco for now and that UCA-6426 would return next week for the Glocks. UCA-6426 reached into UCA-6426's pocket and retrieved $800 in cash and handed it to COURY to pay for the firearm. COURY counted the money in front of the UCAs and then everyone went inside to finalize the sale.

66.    UCA-6426 told UCA-5909 shortly after entering the store that UCA-6426 would wait outside. UCA-6426 stayed outside for the remainder of the purchase. Inside **American Guns & Ammo**, UCA-5909 waited at a small sitting area located to the left of the main entrance. A few minutes later, COURY approached UCA-5909 with a partially completed ATF Form 4473. UCA-5909 noticed that all the boxes on Question 21 of the form were already checked. COURY stated he had checked them for UCA-5909, but then jokingly recanted the previous statement by saying, "I didn't do it, you answered them."

22

COURY asked UCA-5909 to fill in the Place of Birth question. COURY left for a short period of time and then called UCA-5909 to the main counter. COURY asked UCA-5909 to sign and date the now-fully electronically filled and printed ATF Form 4473. UCA-5909 and COURY walked out of **American Guns & Ammo** together and placed the firearm in UCA-6426's vehicle. The UCAs drove away in the vehicle together.

### Undercover Purchase #6

67.    On December 8, 2021, UCA-6426 had the following text message and telephone conversation with COURY:

UCA-6426:   "Buenos dias Al, you working today?"
UCA-6426:   "Can you give me the price for 6 glocks that are 9mm"
COURY:      "Let me ck"
UCA-6426:   Thumbs up emoji
COURY:      "Call me when your free"

68.    UCA-6426 called COURY shortly after the last text message and asked him what he had available. COURY asked UCA-6426 what UCA-6426 was looking for. UCA-6426 asked COURY for whatever 9mm Glocks he had, and asked COURY to give him a bundle. UCA-6426 told COURY that UCA-6426 does not have any issue with the quality. COURY told UCA-6426 that he would set some aside. UCA-6426 asked COURY for the total cost of the firearms and stated UCA-6426 would drop off the money if COURY was available. UCA-6426 also told COURY that UCA-5909 was coming into town later today (December 8, 2021), but that UCA-6426 did not know if UCA-5909 would make it before the store closed. COURY asked UCA-6426, "…What is [UCA-5909] looking for or is this for you?" UCA-6426 hesitated and then replied that it was for "both" (UCA-6426 and UCA-5909). COURY told UCA-6426, "Gotcha, well the reason is because if it's for you I have to do your background check. If it's for [UCA-5909], I have to do [UCA-5909]'s background check. That's why I just want to make sure, who I'm doing the background check for." UCA-6426 told COURY that UCA-5909 would be picking them up tomorrow (December 9, 2021). COURY told UCA-6426 that he would be in the store today and tomorrow. COURY told UCA-6426, "…but if [UCA-5909] is picking them up I'll do the

23

background check for [UCA-5909], because I have to do the background check for the actual purchaser, makes sense." COURY then tells UCA-6426, "alright, so um now if you know what [UCA-5909] wants I can set 'em aside. Do you care like the length or the size or you just want quality 9-millimeter Glocks?" UCA-6426 replied that UCA-6426 wants quality 9-millimeter Glocks. COURY asked UCA-6426, "You don't care what size like compact, sub compact?" UCA-6426 asked COURY what he has that is nice. COURY told UCA-6426, "Well I've got an arrangement of stuff, I just need to know what, what you need." UCA-6426 asked COURY if he had one of each to try them out. COURY told UCA-6426, "Sure, I'll do a variety and then um we'll go from there. I just need to make sure, so ATF doesn't get on my ass that, if [UCA-5909] coming, if [UCA-5909] picking them up, I need to do [UCA-5909]'s background check." UCA-6426 told COURY that UCA-5909 would pick them up. COURY told UCA-6426, "Alright, I will um, I will set six aside, kind of like a little variety pack, and then ah we'll go from there and I'll put a price together, and I'll see you when I see you or see [UCA-5909] when I see [UCA-5909]." UCA-6426 asked COURY to send UCA-6426 the price and told COURY that UCA-6426 would try and stop by today. COURY replied that it was not a big deal, and they could always "square up" (pay) later. COURY told UCA-6426, "...let me get a variety together, get a total, and then we'll go from there."

69.    Shortly after the telephone call, UCA-6426 had the following text message conversation with COURY:

COURY:      "Who's name we putting it under?"
UCA-6426:  "[UCA-5909's first name]"
COURY:      "Last name"
COURY:      "Gas Arata"
COURY:      "Gasataya"
UCA-6426:  "[UCA-5909's full name]"
COURY:      Liked UCA-6426's last text message
COURY:      Emoji with sunglasses
COURY:      Multimedia message displaying a picture of a computer screen with an order for 6 Glock pistols totaling $3,500.
UCA-6426:  Thumbs up emoji
UCA-6426:  "I'll drop by in 30 and pay the bill"

24

70. Approximately an hour after the last text message, UCA-6426 arrived at **American Guns & Ammo** (Still December 8, 2021). COURY told UCA-6426, "Come on let me show you what you got". COURY showed UCA-6426 the firearms, describing their characteristics one at a time. UCA-6426 observed that the receipt/invoice was under UCA-5909's name. While describing the firearms, COURY told UCA-6426 that the only bigger firearm is the Glock 34, but it is for competition shooting. COURY told UCA-6426 that if UCA-6426 starts shooting competition to let COURY know so they (presumably COURY) can "hook [UCA-6426] up." COURY told UCA-6426, "I'm going to start the paperwork, um and figure it out from there, so all's you got to do is get a green light and sign". UCA-6426 reached into UCA-6426's pocket and retrieved $3,500 in cash and handed it to COURY to pay for the firearms. COURY told UCA-6426 the following:

> Now its none of my business, um obviously [UCA-5909]'s buying the guns, um [UCA-5909]'s picking up the guns. Now, anytime you buy more than one I have to let ATF know that you're buying multiple guns, they want to make sure that you're not buying them and selling them. I'm just giving you a heads up, just so you know. I'm not supposed to say, I don't think they care one way or the other. Just, just to let you know that if [UCA-5909] continues to buy stuff like that, [UCA-5909]'s gonna be kind of like on the radar, and um, obviously you guys have nothing to hide so don't worry about it. But just if [UCA-5909] ever gets a phone call, they're gonna want to make sure [UCA-5909]'s not selling stuff. In the State of Arizona, you can buy and have buyers' remorse tomorrow, none of my business, but if they're buying to sell to other people, that's illegal.

71. COURY asked UCA-6426 if UCA-6426 had any questions, comments, or concerns. COURY told UCA-6426 that UCA-6426 was paid for and provided UCA-6426 with a photocopy of the receipt. UCA-6426 departed **American Guns & Ammo**.

72. On December 9, 2021, UCA-6426 had the following text message conversation with COURY:

UCA-6426: "Good morning Al, [UCA-5909] is on [UCA-5909's] way to the store to pick up the order. Are you working today?"

25

COURY:     "Yep"
UCA-6426:  "Ok, [UCA-5909] just text me that [UCA-5909's] almost there. Sorry, you know [UCA-5909] take forever" [Laughing emoji]

73.    Approximately 10 minutes later, UCA-5909 arrived at **American Guns & Ammo**. Once UCA-5909 exited the vehicle, COURY approached and greeted UCA-5909. COURY and UCA-5909 entered the store and went to the main counter. COURY presented UCA-5909 with another electronically pre-filled-out ATF Form 4473 and asked UCA-5909 to date and sign the signature block. UCA-5909 noticed that the transfer date next to the signature block had already been filled in with a handwritten date of December 8, 2021 [the day before, which was the day that UCA-6426 ordered and paid COURY for the firearms]. UCA-5909 did not fill out any portion of the ATF Form 4473 other than the signature block. COURY did not ask for UCA-5909's identification, and COURY did not discuss the form with UCA-5909 other than asking for a signature. COURY provided UCA-5909 with a receipt and volunteered to carry the firearms to UCA-5909's vehicle. Once the firearms were inside of the vehicle, UCA-5909 departed **American Guns & Ammo**. After UCA-5909 departed, COURY sent a text message to UCA-6426 with a thumbs up emoji and hands praying emoji.

74.    A review of the ATF Form 4473 from this transfer shows a handwritten date of December 8, 2021. This date was prefilled out on the form prior to UCA-5909s arrival. The firearm transfer actually occurred on December 9, 2021, meaning that the handwritten date was falsely listed on the form. In addition, TURNER falsely signed the form as the transferor even though she did not conduct the sale or the transfer of the firearms. A comparison of the date falsely written on the form next to UCA-5909's name (top), the date written next to TURNER's signature on the form (middle), and the date written next to TURNER's signature on the ATF Report of Multiple Sale form (bottom), it appears to your Affiant that all three dates were written by TURNER:

26

written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under each law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law.

| 22. Transferee's/Buyer's Signature | | 23. Certification Date | | |
| --- | --- | --- | --- | --- |
| | | Month | Day | Year |
| | | 12 | 08 | 2021 |

*Section C – Must Be Completed By Transferor/Seller Prior To The Transfer Of The Firearm(s)*

the time of transfer, if Section D was completed); and (3) State or local law applicable to the firearms business — It is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section B.

| 34. Transferor's/Seller's Name (please print) | 35. Transferor's/Seller's Signature | 36. Date Transferred | | |
| --- | --- | --- | --- | --- |
| NATALIE TURNER SALES | | Month | Day | Year |
| | | 12 | 08 | 2021 |

REMINDER – By the Close of Business Complete ATF Form 3310.4 for Multiple Sales of Handguns.

| 16. Name of Employee Filling Out This Form | Date |
| --- | --- |
| NATALIE TURNER | 12-08-2021 |

Email form to multiplehandgunsalesforms@atf.gov.

ATF E-Form 3310.4
Revised April 2019

75. COURY's signature does not appear on any of the forms from any of the Undercover Purchases, even though he in fact conducted the sales and the transfers.

## SUBJECT PREMISES A-2

76. COURY and TURNER both identify **Subject Premises A-2** as their address on both of their driver's licenses and vehicle registrations.

77. TURNER is an employee of **American Guns & Ammo** and is listed as the Transferor/Seller on multiple ATF Forms 4473 related to this investigation.

78. Based on this investigation, ATF believes that TURNER is likely the compliance officer for **American Guns & Ammo** and that she is tasked with the administration of the forms and records.

79. COURY is the sole responsible person listed for Al's Guns & Ammo, which has its sole business address at **Subject Premises A-2**.

80. According to ATF records, COURY has transferred firearms from **American Guns & Ammo** to Al's Guns & Ammo as recently as 2021.

81. As noted above, when ATF requested an ATF Form 4473 for purchases from **American Guns & Ammo**, COURY determined that the form was not on the premises.

27

COURY called and sent a text message to TURNER and asked if it was in the box she was working on. TURNER then drove the box containing that form back to **American Guns & Ammo**.

82. Based on this information, it appears that TURNER was working from another location on records of **American Guns & Ammo** and that TURNER drives records back and forth between **American Guns & Ammo** and another location. ATF believes that the other location is likely the **Subject Premises A-2**, which is both her residence and the business location of Al's Guns & Ammo.

83. During Undercover Purchase #4, COURY told the UCAs that he was going to text pictures of the ATF Form 4473 that he handwrote to TURNER. COURY claimed that he did so because TURNER types faster than he does. COURY ultimately returned with a typed copy of the form to be signed. Based on COURY texting the information to TURNER, it appears that TURNER was working from another location, typed the information into the form, and electronically sent it to **American Guns & Ammo** for printing.

84. TURNER entered information that was required to be entered into ATF Forms 4473 by the purchaser. In addition, TURNER signed two of the three ATF Forms 4473 in the Undercover Purchases as Transferor, even though she did not conduct any of the sales to the UCAs, did not verify the purchasers' identity against their identification cards, did not transfer any of the firearms to the UCAs, and was not seen by the UCAs at the **American Guns & Ammo** premises for any of the sales or transfers.

## SUBJECT VEHICLES

85. ATF has seen COURY depart his residence in a silver 2020 GMC Sierra Denali, VIN ending in -8982, Arizona Plate AZGUNZ (**Subject Vehicle A-3**) and a black 2009 GMC Canyon, VIN ending in -4739, Arizona Plate ZAA3EA (**Subject Vehicle A-4**) and arrive at **American Guns & Ammo** approximately fifteen minutes later.

28

86. During several of the Undercover Purchases, ATF has seen **Subject Vehicle A-4** parked in front of **American Guns & Ammo. Subject Vehicle A-4** appears to be COURYs primary work vehicle.

87. ATF has seen a 2019 Chevrolet Corvette, VIN ending in -2355, AZ Plate X3A57B (**Subject Vehicle A-5**), inside the garage and in the driveway of **Subject Premises A-2.**

88. **Subject Vehicle A-3, A-4**, and **A-5** are registered to COURY at **Subject Premises A-2.**

89. From law enforcement databases, ATF is aware that 2020 JEEP Grand Cherokee, VIN ending in -5666, Arizona Plate BDZ3619 (**Subject Vehicle A-6**), was recently purchased and is registered to COURY and TURNER at **Subject Premises A-2.**

90. Based on this investigation, the ATF records of American Guns & Ammo have been transported outside of the business premises and back by TURNER in a vehicle.

## III.   ITEMS TO BE SEIZED

91. Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found at the **Subject Premises**.

92. Based on your Affiants training, education, and experience, and discussions with other trained law enforcement personnel, your Affiant knows the following:

   a. During the Undercover Purchases, it appeared that COURY completed a paper ATF Form 4473 by hand, sent it to TURNER electronically, and TURNER then completed an electronic ATF Form 4473. The electronic ATF Form 4473 was then printed at **Subject Premises A-1** and signed again by the Purchaser. TURNER signed these forms as the Transferor/Seller on an unknown date and time.

   b. FFLs involved with straw purchasing activity and falsifying records often maintain a set of paper records, notes, ledgers, Acquisition and Disposition

29

records, and other documents of their business activities and customers. These records include original (non-electronic) ATF Forms 4473. When records may have been falsified, obtaining and reviewing the original paper documents is one way to determine whether and what information may have been falsified on ATF Forms. FFLs commonly maintain paper records for long periods of time, and they are therefore likely to be found at the **Subject Premises**.

c. COURY affirmatively stated to ATF that he used, computers and other electronic devices to maintain his business records (including ATF Forms 4473, ledgers, Acquisition and Disposition records, payment information, and receipts). In addition, COURY was observed by ATF using cellular telephones to communicate with potential customers, customers, and employees about his business activities. These communications occurred via telephone calls and text messages. Records of electronic communications between the dealer, the dealer's employees, the actual purchaser of the firearms, and the straw purchaser are commonly maintained on cellular telephones or other electronic devices. For all these reasons, evidence related to firearms trafficking activity and false statements on ATF Forms 4473 are likely to be found on electronic storage media found at the **Subject Premises**.

93. In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **Subject Premises**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## IV.    DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA

94.    As described in Attachment B, this application seeks permission to search for records that might be found in or on the **Subject Premises**, in whatever form they are found, including data stored on a computer, cellular telephone, tablet, or other media storage device, such as a thumb drive, CD-ROM, DVD, Blu Ray disk, memory card, or SIM card (hereafter collectively referred to as "electronic storage media"). Thus, the warrant applied for would authorize the seizure of all electronic storage media found in or on the **Subject Premises** and, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

95.    *Probable cause.* Your Affiant submits that if electronic storage media are found in or on the **Subject Premises**, there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on such media, for at least the following reasons:

a.    Your Affiant knows that when an individual uses certain electronic storage media, the electronic storage media may serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic storage media is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic storage media is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that electronic storage media used to commit a crime of this type may contain: data that is evidence of how the electronic storage media was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b.    Based on my knowledge, training, and experience, your Affiant knows that electronic storage media contain electronically stored data, including, but not limited to, records related to communications made to or from the electronic storage media, such as the associated telephone numbers or account identifiers, the dates and times of the

31

communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c. Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic storage medium, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

d. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the electronic storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

e. As previously set forth in this Affidavit, the targets of this investigation have used cellular telephones to send text messages and to make phone calls and appear to have used computers to send emails in furtherance of the crimes described above. Therefore, your Affiant believes that evidence of criminal activity will be found on any electronic storage media found at the **Subject Premises** and that the electronic storage media constitute instrumentalities of the criminal activity.

96. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the electronic storage media were used, the purpose of their use, who used

32

them, and when. There is probable cause to believe that this forensic electronic evidence will be found on any electronic storage media located in or on the **Subject Premises** because:

a.  Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. File systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the owner. Further, activity on an electronic

33

storage medium can indicate how and when the storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on an electronic storage medium may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the existence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera) not previously identified. The geographic and timeline information described herein may either inculpate or exculpate the user of the electronic storage medium. Last, information stored within an electronic storage medium may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to

34

specify in advance the records to be sought, electronic storage medium evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one electronic storage medium is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how an electronic storage medium was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

97.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.      *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine electronic storage media to obtain evidence. Electronic storage media can store a large volume of information.

Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the electronic storage media off-site and reviewing it in a controlled environment allows for a thorough examination with the proper tools and knowledge.

c.    *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of electronic storage media formats that may require off-site reviewing with specialized forensic tools.

98.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

//

//

//

//

//

//

## V.    CONCLUSION

99.    Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 924(a)(1)(A) (False Statements During the Acquisition of a Firearm), 922(m) (False Statements by a Licensed Dealer), are likely to be found at the **Subject Premises,** which are further described in Attachment A.

GREGORY LIPNER  Digitally signed by GREGORY LIPNER
Date: 2022.03.01 15:27:06 -07'00'

Special Agent Gregory Lipner
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me this ___2___ day of ___March___, 2022.

M Morrissey

HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge

37